JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY HYDE, | No. CV 07-2017 PA (CWx) |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| THE HARTFORD, | |
| Defendant. | |

This is an Employee Retirement Income Security Act ("ERISA") action for recovery of long-term disability benefits. Plaintiff Beverly Hyde ("Plaintiff") seeks benefits under a group insurance policy (the "Policy") issued to Time Warner Inc. and its participating subsidiaries, including Warner Bros., by Hartford Life Insurance Company ("Hartford").[1/] On November 10, 2008, following the filing of the Administrative Record and briefing by the parties, the Court, sitting without a jury, conducted a bench trial. Having considered the materials submitted by the parties and reviewed the evidence, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a):

---

[1/]    Hartford Life Insurance Company was erroneously sued as "The Hartford" but filed its Answer to the Complaint using its proper name.

I.  **Factual and Procedural Background**

Plaintiff was employed as an executive secretary at Warner Bros. until August 1998. (Administrative Record ("AR") 721.) In April 1999, she submitted a claim for long term disability benefits as a result of bilateral carpal tunnel syndrome ("CTS"). (AR 721-27.) As part of her claim, Plaintiff's employer prepared an "Employer's Statement" which requested information concerning the physical aspects of Plaintiff's job. According to the form, tasks performed "occasionally" meant that the employee performed them up to 33% of the time, tasks performed "frequently" accounted for 34% to 66% of the employee's time, and tasks performed "continuously" meant that the employee did the activity between 67% and 100% of the time. (AR 722.) Plaintiff's employer reported that she performed no activities "continuously" but did engage in "Keyboard Use/Repetitive Hand Motion" "frequently." (Id.)

Included with Plaintiff's claim was a report prepared by Dr. Brent Miller, an orthopedic surgeon who diagnosed and treated Plaintiff's CTS. (AR 735-39.) In his report prepared following an examination on September 24, 1998, Dr. Miller stated that Plaintiff had told her that she spent about 90% of her time at work typing on a computer. (AR 736.) Dr. Miller also reviewed the results of a nerve conduction study performed on Plaintiff by Dr. Trevor Lynch. (AR 738.) The nerve conduction study showed "only mild discrepancies." (Id.) Hartford approved Plaintiff's claim on July 21, 1999. (AR 661.) In reaching that determination, Hartford concluded that Plaintiff was "totally disabled," which the Policy defines as: "Totally disabled means you are prevented by Disability from doing all the material and substantial duties of your own occupation." (AR 747.)[2]

In October 1999, Hartford learned that Plaintiff was enrolled in a four-year program in interior design at UCLA. (AR 059.) In November 1999, Dr. Miller completed a "Physical Capacities Evaluation Form" which indicated that Plaintiff could "occasionally"

---

[2] Unlike many such policies, the policy at issue here does not change the definition of total disability from one's "own occupation" to "any occupation" after a certain period of time.

-2-

lift up to 20 pounds and also handle, finger, and feel occasionally. (AR 618.) Dr. Miller also noted that Plaintiff could not type or write for more than 20 minutes an hour. (AR 619.) Dr. Miller and Plaintiff had discussed the possibility of surgery several times, but Plaintiff repeatedly postponed the procedure. (AR 52-55.) After conducting an internal review, Hartford terminated Plaintiff's benefits in a letter dated April 17, 2000. (AR 591-94.)

Plaintiff appealed the termination of her benefits. Hartford sent Plaintiff's file to Dr. Coleman Levin for a medical review. Dr. Levin concluded that the medical data supported the limitations that Dr. Miller had imposed on Plaintiff's activities. (AR 570-73.) Following a review by a Hartford appeal specialist, Hartford reinstated Plaintiff's benefits on August 9, 2000. (AR 569.) In a June 2001 report, Dr. Miller reiterated that Plaintiff could still not engage in "continuous keying or writing for more than 20 minutes out of every hour" and concluded that Plaintiff's "condition remained unchanged, and she is still disabled within her own occupation as an executive secretary." (AR 483-84.)

Dr. Miller performed carpal tunnel release surgeries on both of Plaintiff's wrists in December 2001. Following those procedures, in an April 2002 report, Dr. Miller stated that Plaintiff could "occasionally" lift up to 20 pounds and also handle, finger, and feel occasionally. (AR 391-92.) Dr. Miller also opined that Plaintiff could not repetitively use either of her hands. (AR 392.) A May 2002 report from Dr. Miller similarly concluded that despite the surgeries, Plaintiff would "still have the working restrictions of no continuous keying or writing more than 20 minutes out of every hour, and no repetitive strenuous gripping or grasping with either hand." (AR 381.)

Hartford ordered video surveillance of Plaintiff in August and September 2005. The surveillance showed Plaintiff placing two large dogs into her station wagon, driving to a mall, shopping, carrying a box, pushing a shopping cart, loading items from the shopping cart into her car, transferring items from her car to her house, and carrying a large folding table. Plaintiff was then interviewed in her attorney's office by Hartford on December 7, 2005. In that interview, Plaintiff stated that she had "full use of my hands and fingers on my best day but only for ten to fifteen minute intervals and then I have to rest my hands for

-3-

thirty minutes before I can use my hands again. . . . I am able to write for about five minutes on my best day and the pain, numbness, and tingling keep me from writing any longer.  If I rest my hands for about thirty minutes I could probably write some more.  I can no longer type."  (AR 822.)

Hartford received updated medical records from Dr. Miller in March 2006.  (AR 168-230.)  Those records indicated that Dr. Miller performed a right trigger thumb release in January 2006.  (AR 193.)  Brian Holbrook, a Hartford claims examiner, reviewed Plaintiff's file.  Based on his review of the file, Holbrook concluded that Plaintiff "would have the functionality to perform a sedentary occupation."  (AR 014.)  Holbrook referred Plaintiff's file for a medical case management review which was performed by Connie Behrle, a nurse.  (AR 012.)  Behrle wrote to Dr. Miller, enclosing the video surveillance and a copy of Plaintiff's December 2005 interview, and asked Dr. Miller to assess whether Plaintiff "is capable of performing a full time sedentary occupation with no repetitive/constant hand movements?"  (AR 166-67.)  Dr. Miller agreed that Plaintiff could perform such work.  (AR 162.)  Although Behrle's inquiry acknowledged that Plaintiff's position required "frequent" typing, Dr. Miller was not asked if Plaintiff could perform an occupation requiring frequent hand movements. (AR 166-67.)

Hartford conducted an employability analysis for Plaintiff (AR 127-57) which appears to be based on Plaintiff being able to perform handling and fingering frequently and feeling constantly. (AR 132.)  The results of the employability analysis indicated a number of occupations Plaintiff could perform, including identification clerk, dispatcher, calendar control clerk, customer complaint clerk, insurance clerk, service clerk, skip tracer, scheduler, routing clerk, and surveillance system monitor.  (AR 127.)  After receiving the employability analysis, Holbrook recommended that Plaintiff's benefits be terminated.  (AR 008.)  The claim was referred to Hartford's Peter Johnson, a team leader, who, based on a review of the medical case management review, the surveillance video, the employability analysis, and Dr. Miller's opinion that Plaintiff could perform a sedentary occupation with no repetitive or constant hand movements, concluded that Plaintiff "has the functionality to

1  perform full time sed[entary] work." (AR 008.)  Hartford never required Plaintiff to be
2  examined by an independent medical examiner.
3    In a letter dated March 28, 2006, Hartford terminated Plaintiff's benefits effective
4  March 31, 2006. (AR 121-26.)  Plaintiff was informed of her appeal rights (AR 125) and an
5  appeal was filed on her behalf by her attorney. (AR 112-13.)  On May 23, 2006, Plaintiff's
6  attorney forwarded a letter dated May 15, 2006 from Dr. Miller to Hartford. (Ownbey Decl.,
7  Ex. D.)  That letter was not addressed to the Hartford personnel responsible for handling
8  Plaintiff's claim and apparently was not reviewed during the appeal or made part of the
9  Administrative Record. (AR 005.)  In the letter, Dr. Miller reiterates that Plaintiff cannot
10 engage in "continuous keying or writing more than 20 minutes out of every hour, and no
11 repetitive, strenuous gripping or grasping with either hand." (Ownbey Decl., Ex. D.)
12 According to Dr. Miller, "the typing and writing restriction basically precluded her from
13 returning to her usual and customary occupation" of executive secretary and her "work
14 preclusions do remain the same." (Id.)  Hartford denied Plaintiff's appeal in a letter dated
15 July 12, 2006. (AR 086-87.)  Plaintiff commenced this action on March 27, 2007.
16   In its trial briefs, Hartford argued that it was the wrong party because it was merely
17 the insurer and not the "plan administrator."  During the trial, however, when it could
18 provide no facts establishing that there was any prejudice to prevent Plaintiff from amending
19 the Complaint to add the proper party, Hartford waived that defense and requested that the
20 Court proceed with the action against it.  Also during the trial, once it became clear that
21 Hartford's decision to deny Plaintiff's appeal had not had the benefit of Dr. Miller's May 15,
22 2006 letter, the Court remanded the action for Hartford to consider Dr. Miller's letter.
23   On remand, Hartford considered Dr. Miller's letter but affirmed its decision to
24 terminate Plaintiff's benefits.  The Court then directed the parties to file proposed findings
25 of fact and conclusions of law and, upon receiving them, deemed the matter submitted.
26 **II.    Jurisdiction and Venue**
27   This action involves a claim for long term disability benefits under an employee
28 welfare benefit plan regulated by ERISA.  As such, the Court has original jurisdiction over

1  this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).  See, e.g., Metro. Life Ins. Co.
2  v. Taylor, 481 U.S. 58, 63, 107 S. Ct. 1542, 1546, 95 L. Ed. 2d 55 (1987); Parrino v. FHP,
3  Inc., 146 F.3d 699, 703-04 (9th Cir. 1998).  Venue in the United States District Court for the
4  Central District of California is invoked pursuant to 29 U.S.C. § 1132(e)(2).  The parties do
5  not dispute the facts requisite to federal jurisdiction and venue.

6  **III.    Standard of Review**

7        A "denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed
8  under a de novo standard unless the benefit plan gives the administrator or fiduciary
9  discretionary authority to determine eligibility for benefits or to construe the terms of the
10 plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57,
11 103 L. Ed. 2d 80 (1989); Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d
12 863, 866 (9th Cir. 2008).  Where the plan vests such discretionary authority in the
13 administrator or fiduciary, the Court reviews the denial of benefits under the plan for an
14 abuse of discretion.  Firestone, 489 U.S. at 115, 109 S. Ct. at 957.  However, in order for the
15 abuse of discretion standard to apply, the Plan must unambiguously grant discretion to the
16 administrator or fiduciary.  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1089 (9th Cir.
17 1999).

18       In this case, the policy confers discretionary authority on Hartford.  Specifically, the
19 policy provides in relevant part that: "The Hartford has full discretion and authority to
20 determine eligibility for benefits and to construe and interpret all terms and provisions of the
21 Group Insurance Policy."  (AR 747.)  The Court concludes that the foregoing language
22 unambiguously grants discretion to Hartford.

23       Once the Court concludes that the policy vests discretionary authority in the
24 administrator or fiduciary, the Court must determine whether the administrator or fiduciary
25 is operating under a conflict of interest.  In recent decisions, first the Ninth Circuit, and then
26 the Supreme Court, determined that the abuse of discretion standard still applies even when
27 the administrator has a conflict of interest.  See Metro. Life Ins. Co. v. Glenn, 128 S. Ct.
28 2343, 2346, 171 L. Ed. 2d 299 (2008) ("Often the entity that administers the plan, such as an

employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket. We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case."); Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965 (2006) ("Abuse of discretion review applies to a discretion-granting plan even if the administrator has a conflict of interest. But Firestone also makes clear that the existence of a conflict of interest is relevant to how a court conducts abuse of discretion review.").

Where, as here, an insurer "acts as both the plan administrator and the funding source for benefits," the insurer "operates under what may be termed a structural conflict of interest." Abatie, 458 F.3d at 965. In the case of such a structural conflict of interest, the Court is to apply an abuse of discretion review which is "tempered by skepticism commensurate with the plan administrator's conflict of interest." Id. at 968. As the Supreme Court explained:

> We believe that Firestone means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. . . . In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance.

Glenn, 128 S. Ct. at 2351; see also Abatie, 458 F.3d at 968 ("A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might."); id. at 968-69 ("The level of skepticism

-7-

with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.") (internal citations omitted).

"What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." Abatie, 458 F. 3d at 969.  In other words, "[a] district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage." Id. at 968; Saffon, 522 F.3d at 868-69.  "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." Abatie, 458 F.3d at 970.

**IV.   Analysis**

Other than Hartford's admission that it acts as both the funding source and the administrator, Plaintiff has submitted no facts concerning the extent of Hartford's conflict of interest or a history of questionable claims-handling practices.  See Saffon, 522 F.3d at 868. What the record establishes in this case, however, is a claims decision that was based to a substantial degree on a response from Plaintiff's physician which, contrary to Hartford's assertions, does not establish that she is able to do all of the "material and substantial duties" of her "own occupation."  Hartford also relied on an analysis of other jobs Plaintiff might be able to perform despite the fact that the policy's definition of total disability is limited to her

"own occupation" and video surveillance which did not show Plaintiff doing many of the things she would be required to do as an executive secretary. In these circumstances, Hartford's decision, though still analyzed for an abuse of discretion, is entitled to less deference than it would have been had Hartford not been operating under a structural conflict of interest.

The principal medical evidence upon which Hartford relies to support its decision to terminate Plaintiff's benefits is Dr. Miller's response to Behrle's March 9, 2006 inquiry. In that response, Dr. Miller was asked a yes or no question about Plaintiff's level of functionality. Specifically, the question asked:

> The functionality seen in the surveillance and Ms. Hyde's own statement of functionality would seem to indicate that she is capable of a full time sedentary occupation as defined by the Department of Labor with no repetitive/constant hand or wrist movements. In your professional opinion do you feel that she is capable of performing a full time sedentary occupation with no repetitive/constant hand movements?

(AR 162.) The problem with Hartford's question, and its reliance on Dr. Miller's affirmative response to it, is that it does not solicit the determinative information. Crucially, under the Department of Labor standards, executive secretaries or administrative assistants are expected to type "frequently." Asking Dr. Miller whether Plaintiff could perform a sedentary occupation with no repetitive/constant hand movements is not the same as asking him if Plaintiff could perform a sedentary occupation with frequent hand movements, fingering, or typing. Put simply, Dr. Miller's "yes" answer to the question posed by Hartford fails to provide evidence that Plaintiff is not disabled under the policy's definition of total disability. Because of the confusing and incomplete nature of Hartford's question, there is nothing inconsistent between Dr. Miller's response to it and his medial opinion, reiterated in his May 15, 2006 letter, that Plaintiff is unable to perform her "own occupation."

-9-

1    Additionally, while Hartford's letters terminating Plaintiff's benefits and denying her
2    appeal accurately quoted the policy's "own occupation" standard, Hartford's decision
3    appears to have been based, at least in part, on an occupational analysis which showed that
4    Plaintiff could perform other jobs.  While this information would certainly be relevant to a
5    policy which limited benefits only to those unable to perform "any occupation," Hartford
6    never explains how that information is relevant in this instance.  The inclusion of this
7    information in the letter terminating Plaintiff's benefits therefore suggests that factors other
8    than the merits of Plaintiff's claim may have influenced Hartford's decision.  As a result,
9    that decision is entitled to less deference.

   Similarly, Hartford's reliance on the video surveillance is unpersuasive.  Although it
may support Hartford's suspicions that Plaintiff has overstated the extent of her disability,
that video falls well short of supporting a finding that she is capable of performing the duties
of an executive secretary.  Tellingly, the video never shows Plaintiff typing or performing
the type of hand movements with the frequency required of her "own occupation."  Again,
while the video surveillance may well establish that Plaintiff is capable of performing an
occupation, it does not come close to establishing that she can perform her "own
occupation."

   In light of the these irregularities in the claims-handling process and Hartford's
structural conflict of interest, the Court concludes that, at least based on the record before it,
Hartford abused its discretion in terminating Plaintiff's benefits.

## **Conclusion**

   For all of the foregoing reasons, the Court finds that Hartford abused its discretion
when it concluded that Plaintiff was not totally disabled from performing her own
occupation. Based on the current Administrative Record, the Court concludes that Plaintiff
. . . .
. . . .
. . . .
. . . .

-10-

is totally disabled as defined by the Policy. Accordingly, the Court will enter judgment in favor of Plaintiff.

IT IS SO ORDERED.

DATED: February 5, 2009

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE

-11-